Penn-Ohio Steel Corporation, et al. [1] v. Commissioner. Penn-Ohio Steel Corp. v. Commissioner
Docket Nos. 84058-84060.
United States Tax Court
T.C. Memo 1964-124; 1964 Tax Ct. Memo LEXIS 211; 23 T.C.M. (CCH) 719; T.C.M. (RIA) 64124; May 5, 1964
*211 Held: Respondent failed to prove by clear and convincing evidence that each petitioner filed a false or fraudulent return with intent to evade tax. Therefore, assessments of deficiencies are barred by the statute of limitations. Secs. 276(a), 1112, 1939 Code. David Brady, 120 Broadway, New York, N. Y., for the petitioners. Ira L. Tilzer, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined income tax deficiencies for the calendar year *212 1949, and 50 percent additions thereto for fraud with intent to evade tax under section 293(b), 1939 Code, as follows: Docket
Numbers
Taxpayer
Deficiency
Sec. 293(b)
Total
84058
Penn-Ohio Steel
$264,493.56
$133,640.21
$398,133.77
84059
J. B. Montgomery
43,139.60
21,569.95
64,709.85
84060
S. E. Magid
95,471.16
47,735.58
143,206.74
Totals
$403,104.62
$202,945.74
$606,050.36
The main question is whether each of the petitioners filed a false or fraudulent return for 1949 with intent to evade tax. In each case, assessment and collection of deficiencies for 1949 are barred by the statute of limitations unless, under his burden of proof, the respondent established by clear and convincing evidence that the taxpayer filed a false or fraudulent return. Section 276(a), 1939 Code. Montgomery and Magid were stockholders of Penn-Ohio Steel Corporation. The corporation had a contract with Allis-Chalmers Manufacturing Company to furnish steel to the latter. Allis-Chalmers cancelled the contract in 1949 and made a demand for damages on Penn-Ohio. The resulting dispute was settled in 1949. Respondent determined that the settlement agreements constituted *213 a tax evasion scheme. Whether or not each petitioner filed a false return involves the settlement agreements. Findings of Fact The stipulated facts are incorporated herein by this reference and are found as stipulated. The returns for 1949 were filed in 1950, as set forth hereinafter. Each statutory notice of deficiency was mailed by the respondent on September 2, 1959. None of the petitioners, prior to the expiration of the 3-year period of limitation upon the assessment and collection of tax prescribed by section 275(a), 1939 Code, executed a waiver consenting to the assessment of the tax after the expiration of such period of limitation. The returns for 1949 were filed on the following dates: The return of Penn-Ohio Steel Corporation was filed on April 14, 1950, with the collector of internal revenue for the first district of Pennsylvania. The joint return of Joseph B. Montgomery, Jr., and his wife, was filed on January 16, 1950, with the collector of internal revenue for the eighteenth district of Ohio. The joint return of Samuel E. Magid and his wife was filed on May 15, 1950, with the collector of internal revenue for the third district of New York. In the cases of *214 the individual taxpayers, since the wives are not involved, Joseph B. Montgomery, Jr., and Samuel E. Magid are referred to hereinafter as the individual petitioners. Penn-Ohio Steel Corporation, hereinafter called Penn, is a Delaware corporation which was incorporated in January 1948 for the purpose of manufacturing and selling steel ingots. Joseph B. Montgomery, Jr., was its president; Samuel E. Magid was treasurer and chairman of the board of directors; and John G. Baker, hereinafter called Baker, was assistant to Montgomery. In 1948, there was a shortage of steel ingots, and there was great demand for them among those who used them in manufacturing steel products. Manufacturers were willing to pay premium prices for steel ingots. Montgomery has had a great deal of experience in the manufacture of steel. In May 1948, he and Magid located an idle open-hearth foundry at Birdsboro, Pennsylvania, formerly operated by the Birdsboro Steel Foundry & Machine Company, which was then controlled by the United States Navy Department as a national defense plant and industrial reserve facility. They made a proposal to the Navy Department to lease this Naval Industrial Reserve Plant at Birdsboro *215 for the purpose of producing steel ingots. In June 1948, the Navy Department and Penn-Ohio Steel Corporation entered into a 5-year lease agreement under a Letter of Intent of the Navy Department which gave Penn the option to extend the term of the lease for two additional terms of 5 years, each. The Navy Department required, as a condition of the lease, that Penn must have control of working capital of at least $700,000 within 60 days after accepting the Letter of Intent. In 1948, the authorized capital of Penn consisted of 7,500 shares of no par value common stock, and 5,000 shares of 5 percent cumulative preferred stock of a par value of $100 per share. As of June 30, 1948, none of the preferred stock had been issued. The records of Penn indicate that the 7,500 shares of common stock were issued in equal amounts to three stockholders for the total paid-in amount of $205,000; i.e., 2,500 shares, each, were issued to Montgomery, Magid, and P. T. Baker. At some time in 1948 or 1949, the 2,500 shares owned by P. T. Baker were acquired by John G. Baker, referred to above. In the spring and early summer of 1948, Allis-Chalmers Manufacturing Company in Milwaukee, Wisconsin, hereinafter *216 called Allis, was desperately in need of obtaining steel ingots. It entered into negotiations to obtain them from Penn under a supply contract. In the negotiations, Magid represented Penn, and Walter E. Hawkinson, who was then the secretary and treasurer of Allis, represented Allis. During the negotiations, Magid and Montgomery represented that Penn had just taken possession of the steel plant at Birdsboro under a lease from the Navy and that with proper financing Penn could increase its capital and construct an additional furnace, and that Penn could negotiate a contract with other companies. Magid also stated that he and the other stockholders of Penn had an opportunity at that time of selling part of their common stock for an immediate profit of $500,000. During the negotiations, the Executive Committee of Allis was aware of the then deficit in the supply of steel ingots which was available to Allis. Representatives of Allis urged Magid to agree to a supply contract between Penn and Allis and assured him that Allis would assist Penn in obtaining an additional furnace, which would increase Penn's production of steel, provided Allis receive a priority in such increased production. *217 On August 26, 1948, the Executive Committee of Allis adopted resolutions authorizing the officers of Allis to enter into a purchase agreement with Penn for 50,000 gross tons of steel ingots, and authorizing the purchase by Allis of all of the authorized preferred stock of Penn, 5,000 shares, at the par value of $100 per share, or $500,000, as part of the consideration for the proposed steel purchase agreement. The agreement of Allis to purchase the preferred stock of Penn for $500,000 assured Penn of working capital of $700,000, as required by the Navy Department. On August 26, 1948, a supply contract was entered into by Penn and Allis, and on August 27, 1948, Allis purchased 5,000 shares of Penn preferred stock for $500,000. Under a supplemental agreement the holders of the common stock of Penn agreed jointly and severally to guarantee the payment of dividends on the preferred stock and the maintenance of a sinking fund to retire the preferred stock; and they agreed that a nominee of Allis would be elected to the board of directors of Penn and would serve as long as any of the preferred stock was held by Allis. The supply contract of August 26, 1948, provided in material part *218 as follows: As a result of our several discussions on the subject of producing basic open hearth steel ingots for you, it is agreed that we will produce and ship 50,000 gross tons at the rate of 3,000 G.T. in September, 1948 and 4,000 G.T. each month thereafter from ingot molds of the following sizes: 21inch X 48inch X 76inch; 22inch X 25 1/2inch X 78inch; 22inch X 24inch X 70inch; or other sizes to be agreed upon at a latter date. Our present estimated capacity is 7,500 G.T. per month and it is agreed that your orders shall be given priority over all other contracts for delivery of steel ingots. During the life of this contract for the production for you of ingots, we will give you the first refusal of any additional capacity created by installation of new furnaces which we may develop on terms mutually satisfactory. It is further agreed that the cost to you for this steel will be arrived at on a conversion basis substantially as follows: the average cost at Birdsboro, Pennsylvania of steel scrap, iron scrap and/or pig iron shall be determined each month from our records, subject to your audit, to which is added 10% plus $41.00 per G.T. For example, the iron and steel average *219 may be $53.50; add 10%, or $5.35, plus $41.00, equals $99.85 per G.T. at Birdsboro. Should you elect to supply direct scrap, steel or iron, of suitable quality at prices lower than our buying prices for your account, we will, of course, process such scrap and reflect the reduced cost in the price you pay for conversion into ingots. Furthermore, if you should supply pig iron it would likewise assist in reducing the ingot cost since the current market pig iron price is lower than the price for best grades of iron scrap. The $41.00 figure in the conversion formula includes the recent increase in steel wages and said amount will remain unchanged unless further changes in wages or in items such as fuel oil, refractories, etc., are advanced or decreased so as to affect our conversion costs one percent or more. * * *
Our discussions with your representatives indicate your requirements will be generally within the range of standard 1010 and 1015 basic open hearth rimmed steel or steel of other analysis to be agreed upon between the metallurgist of your company and ours. Our organization is composed of men who have for many years produced this type of steel and by working very closely *220 with your purchasing and metallurgical departments I am confident we will produce for you very good quality ingots for rolling into flat products. We will give access to our property and records to your qualified representatives at any reasonable time. This agreement shall continue in force after the delivery of the 50,000 G.T. subject to termination by either party on 120 days' notice. This letter is submitted in duplicate and your acceptance on the carbon copy will constitute an agreement for the use of our conversion facilities. Under the contract Penn was to deliver 15,000 gross tons of ingots to Allis during the 4 months of September through December 1948, and 35,000 gross tons thereafter at the rate of 4,000 tons per month, so that the original term of the contract would have ended in September 1949. Allis was to have the first offer of any additional production capacity if Penn installed an extra furnace. The contract was to continue in force after the delivery of the first 50,000 gross tons, subject to termination by either party on 120 days' notice. On March 31, 1949, Allis gave Penn written notice that it would not continue the contract beyond the first 50,000 tons. *221 As of April 7, 1949, Allis had placed orders with Penn for the shipment of 27,051 tons of ingots. There remained unordered and undelivered 22,949 tons of the 50,000 tons for which Allis had contracted. On April 7, 1949, Allis terminated the contract, thereby cancelling the contract with respect to the unordered portion. The letter of cancellation of the contract, set forth below, charged Penn with breaches of contract, failure to carry out agreements relating to the preferred stock, and set forth a claim for damages of $1,230,000, as follows: Please be advised that due to the repeated breaches by you of your contract, dated August 26, 1948, with the undersigned Allis-Chalmers Manufacturing Company, we are hereby terminating said agreement, effective on the completion and shipment by you of the steel for which releases and shipping directions have heretofore been sent you, amounting in the aggregate of about 30,000 gross tons. You have breached said contract in many respects, such as, but not limited to the following: (1) You failed to deliver the requisite tonnage in the crucial months of September and October, 1948, at which time Allis-Chalmers was most desirous of receiving *222 this steel; (2) Your failure to make up in December, 1948 and January, 1949 the shortages accruing in September and October, 1948, as per your promise. (3) Your failure to give Allis-Chalmers its priority on steel production over and above the amount stated in the contract during the period beginning September, 1948. (4) The non-compliance with the terms and provisions concerning the Cumulative Preferred Stock; (5) We seriously question the accuracy of the costs as charged to us and we will seek to determine the correctness thereof. We feel that by reason of the damages sustained by us because of your breaches of contract, as above set forth, the conversion charges on the above amount of steel shipped, amounting to about $1,230,000.00 should be paid to us as damages. There was a substantial basis for the claim of Allis that Penn had failed to fulfill all of its obligations under the supply contract and the agreement relating to the preferred stock purchased by Allis. Penn had shipped steel to Ford Motor Company instead of to Allis, which provided the ground for the claim that Allis had not been given the priority of Penn's steel production. There was noncompliance by Penn *223 with the terms of the preferred stock agreement; dividends and sinking fund payments were in arrears; and a nominee of Allis had not been elected to the board of directors of Penn. The actions of Allis in terminating the contract and demanding Penn's payment of damages of $1,230,000, were undertaken upon careful consideration, in good faith, and from the viewpointof the greatest advantage and benefit to Allis. Penn was in serious breach of its contract with Allis. Moreover, in March 1949, the market for steel ingots had changed and improved so that conditions were more favorable for purchasers of ingots. By April 1949, steel ingots were in easier supply and prices were lower. Unbeknown to the officers and directors of Penn, Allis had reconsidered the terms of the supply contract with Penn and concluded that the contract prices had become unfavorable, costly, and disadvantageous to Allis. This reappraisal by Allis of the terms of the contract were not divulged to Magid or Montgomery or others connected with Penn at any time during the negotiations which ultimately were concluded in April and May 1949 by the execution of agreements. After the Allis cancellation of the contract, *224 there were extended negotiations under the supervision of the Executive Committee of Allis. It was the desire of the chief officers of Allis to avoid litigation. Allis gave Hawkinson full authorization to carry on negotiations, subject to the approval of the Executive Committee. In these negotiations, Magid served in a dual capacity. He represented the Penn corporation as the party to the cancelled contract. He also represented himself, Montgomery, and Baker, who made personal, individual claims against Allis. The first meeting between Hawkinson and Magid was on April 18, 1949. At this meeting Magid protested to and reminded Hawkinson that, as individuals, he, Baker, and Montgomery, before Penn and Allis had executed the 1948 contract, had given up an opportunity to sell some of their Penn common stock at a profit of $500,000, and that he had so advised Hawkinson before the execution of the steel contract between Allis and Penn. Magid reminded Hawkinson that he and his associates had given up that opportunity and, also, an opportunity to negotiate steel contracts for Penn with other concerns because of the assurances of Allis which had persuaded him and his associates to believe *225 that in the long run it would be preferable to supply Allis with steel. Magid advised Hawkinson that, therefore, there were two separate and distinct problems to be negotiated: (1) The settlement on a fair basis of the Allis claim for the payment of damages by Penn to Allis. (2) The personal and individual claims which Montgomery, Baker, and himself would and did then make against Allis to compensate them, as individuals, for their reliance upon the assurances of Allis which had caused them to torego in 1948 an opportunity to make a profitable sale of part of their Penn stock. The individual losses asserted represented their losses as investors in the common stock of Penn which was adversely affected by the cancellation of the contract with Penn. It was clear at the beginning of the negotiations with Hawkinson that Magid would act as the representative of (1) Penn, against which Allis had made claims, and (2) the three individuals who made personal claims against Allis. Throughout the negotiations, Allis claimed, in addition to the payment of damages by Penn, that Penn must redeem all of the preferred stock at par, $500,000, and pay Allis the accrued and unpaid preferred stock dividends *226 which amounted to $16,666.64. The Allis Executive Committee directed Hawkinson that it would be necessary to settle and "clean up" both the contract dispute with Penn and the personal claims of the individuals, so as to get rid of both problems; and that neither dispute could be settled unless the other was settled and Allis was released from all claims. Hawkinson prepared for his own use during his discussions with Magid several personal memoranda in which he made notations of what at the time seemed important to him, but he did not include in them notations of everything that was discussed with Magid, or about every meeting with Magid, because the memoranda were intended only for Hawkinson's personal use. These memoranda were not corporate records of Allis. In view of breaches of contract by Penn, it was not contemplated by the Executive Committee of Allis that Allis would pay any money to the Penn corporation by way of settlement of the contract cancellation dispute. The Executive Committee of Allis did not authorize Hawkinson to negotiate with respect to or agree to the payment of any money by Allis to the Penn corporation by way of settlement. The position of Allis was that *227 the Penn corporation had committed breaches of contract for which Allis was entitled to receive payment of damages and that Allis was not obligated to pay anything to Penn because of Penn's breaches of contract. During the negotiations dealing with the contract problem, Hawkinson eventually arrived at a figure for damages to be paid by Penn to Allis on the basis of the maximum which Penn could afford to pay and not on the basis of how much Penn owed Allis. In the negotiations dealing with the claims of the individual stockholders of Penn against Allis, Magid emphasized that on the basis of assurances given by Allis, he had made commitments to Montgomery and Baker for purchasing from them part of their Penn common stock at a very substantial price, and at one stage of the negotiations Magid showed Hawkinson his written commitments. After extended negotiations by Hawkinson and Magid, Allis and Penn agreed to a basis for settling the steel contract dispute. Allis agreed to waive the unpaid dividends on the preferred stock, to accept $500,000 in redemption of the preferred stock, and to accept a payment by Penn of $270,000, which represented restitution of the amount of overcharges *228 by Penn on steel shipped, which payment would be in lieu of all damages claimed by Allis. The sum of $270,000 represented a payment of $10 per ton on the approximately 27,000 tons of steel ingots which Penn had shipped to Allis. Allis believed it was entitled to receive restitution in the above amount, at least, by reason of overcharges by Penn on steel shipped, with reference to the price formula contained in the steel contract. On April 29, 1949, Allis and Penn executed an agreement incorporating the above settlement of the cancelled contract. Subsequently, an agreement was reached in settlement of the personal and individual claims of Magid, Montgomery, and Baker, which provided that Allis would purchase from them 1,500 shares of the common stock of Penn for $470,000, and a contract was prepared by Allis' counsel and executed. It provided that Allis would purchase 1,500 shares of Penn common stock from Magid and his associates for $470,000. The contract was executed before May 5, 1949. On May 5, 1949, the board of directors of Allis approved the two contracts above described, after Hawkinson reported that each settlement contract had been executed. On May 6, 1949, Magid suggested, *229 and it was agreed, that preferred and common stock of Tungsten Alloy Manufacturing Co., Inc., a New Jersey corporation, should be substituted for the 1,500 shares of Penn common stock in the agreement between Allis and Magid in settlement of the individual claims of Magid and his associates. The substitution of the Tungsten Alloy stock, in Hawkinson's opinion, did not represent any material change in the nature of the settlement of the individuals' claims, and he obtained the approval of Walter Geist, the president of Allis, and Louis Quarles, the general counsel of Allis, of the substitution of stock. Hawkinson noted in a memorandum to Geist, dated May 6, 1949, that the substitution of the Tungsten Alloy stock for Penn common stock probably would be preferable because of Hawkinson's assurance to Magid that Allis would assist Penn in Penn's effort to obtain termination of the Navy lease of the Birdsboro plant, and, therefore, it would be better if Allis did not become a stockholder of Penn. In view of the substitution of the Tungsten Alloy stock, the executed contract for the purchase of 1,500 shares of Penn common stock by Allis was destroyed. Before it was destroyed, it was used *230 in the preparation of substitute contracts, which were prepared by counsel for Allis, and were executed. One contract, between Allis and Magid, dated May 11, 1949, provided that Allis would purchase 100 shares of Tungsten Alloy common stock from Magid for $450,000. Allis also entered into a contract dated May 10, 1949, with Tungsten Alloy Manufacturing Co. under which Allis agreed to purchase for $30,000, 1,200 shares of 6 percent preferred stock of Tungsten. Allis entered into a second contract with Tungsten Alloy dated May 11, 1949, relating to the possible purchase by Allis of tungsten carbide from Tungsten Alloy and possible services to be rendered by that corporation. These contracts were executed by Allis and Tungsten Alloy. Tungsten Alloy Corporation was not controlled by either Penn, Magid, Baker, or Montgomery. Each of the settlements, with Penn on the one hand, and with Magid for himself and his associates, on the other hand, were separate settlements. However, they were interdependent because the Allis Executive Committee had directed Hawkinson that no settlement of one dispute could be concluded unless the other dispute was also settled and both settlements resulted *231 in a clean up of all of the disputes and respective claims, and releases of all claims were obtained. The settlement agreement between Allis and Penn dated April 29, 1949, was as follows: Under date of August 26, 1948, the parties hereto entered into a written contract for sale by the Steel Corporation to Allis-Chalmers of fifty thousand (50,000) gross tons of steel ingots, the delivery dates to be in accordance with the schedule set forth in said contract, at prices as specified in said contract; That from time to time said Steel Corporation failed to deliver the tonnage required to be delivered by it to Allis-Chalmers under the terms of said contract in substantial and material amounts. Said failure to deliver on the part of the Steel Corporation constituted a material and substantial breach of said contract which caused material and substantial damages to Allis-Chalmers; NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties do hereby agree as follows: 1. Within ten (10) days from the date of the execution of this contract, Steel Corporation hereby agrees to pay to Allis-Chalmers the sum of Seven Hundred Seventy Thousand Dollars ($770,000.00) *232 in full payment and discharge of the damages sustained by Allis-Chalmers by reason of the breach of the contract above referred to and in payment for the surrender of said Allis-Chalmers to Steel Corporation of the 5,000 shares of 5% Cumulative Preferred Stock of the Steel Corporation now owned by said Allis-Chalmers. Upon payment to it of said sum of money said Allis-Chalmers agrees to deliver to said Steel Corporation stock certificates for said 5,000 shares of Preferred Stock duly endorsed in blank. 2. The parties do hereby mutually cancel and terminate as of the close of business on April 30, 1949, said agreement of purchase as to the unshipped portion thereof, being 22,949 gross tons, and said Steel Corporation hereby releases Allis-Chalmers from all obligation to accept delivery of said unshipped steel, and Allis-Chalmers hereby releases said Steel Corporation from all obligation to ship all said unshipped steel, all without any right or claims by one party against the other. The May 10, 1949 agreement between Allis and Tungsten Alloy Manufacturing Co., Inc., provided: In consideration of the mutual agreements herein contained, the first party hereby agrees to sell to second *233 party, and second party hereby agrees to buy from first party, twelve hundred (1200) shares of the $25 Par 6% Preferred Stock of Tungsten Allow Manufacturing Co., Inc., a New Jersey corporation, with its principal office in Newark, N.J., and to pay therefor upon delivery of said stock certificate the sum of Thirty Thousand Dollars ($30,000), said transaction to be completed promptly after the date of execution hereof. The May 11, 1949, agreement between Allis and the Tungsten Alloy Corporation provided: WHEREAS, Allis-Chalmers Manufacturing Company has by agreement dated this day agreed to buy from first party twelve hundred (1200) shares of 6% Preferred Stock of Tungsten Alloy Manufacturing Co., Inc., having a par value of $25.00 per share. NOW, THEREFORE, in consideration therefor said first party hereby agrees with and for the benefit of said Allis-Chalmers Manufacturing Company, as follows: 1. At any time within six (6) months from the date hereof, on written request of said Allis-Chalmers Manufacturing Company, the first party hereby agrees to secure for said Allis-Chalmers Manufacturing Company with a steel manufacturer reasonably acceptable to it, a good and binding *234 contract for the manufacture, sale and delivery of anywhere up to 50,000 gross tons of steel ingots, to be delivered at the rate of not to exceed four thousand (4,000) gross tons per month, the price therefor to be the average cost of steel scrap, iron scrap and/or pig iron used in such production as determined from the records of said Steel Corporation, subject to audit by said purchaser, to which shall be added ten per cent (10%) plus $40.00 per gross ton. 2. At any time within six (6) months from the date hereof Allis-Chalmers Manufacturing Company shall have the right to require Tungsten Alloy Manufacturing Co., Inc. to enter into a contract to sell and deliver to said Allis-Chalmers Manufacturing Company up to one-half (1/2) of the first party's monthly capacity of tungsten carbide and "Speedaloy" at prices to be five percent (5%) less than the lowest prices paid to Tungsten Alloy Manufacturing Co., Inc. for similar materials. 3. In the event Allis-Chalmers Manufacturing Company elects to obtain either or both of said contracts it shall give written notice of such election not less than thirty (30) days prior to the expiration of said six-month period. 4. At any time within *235 six (6) months from the date hereof, on written request of said Allis-Chalmers Manufacturing Company, the first party hereby agrees to sell to Allis-Chalmers Manufacturing Company up to one-fourth (1/4) of the first party's capacity of tungsten carbide and "Speedaloy" at prices to be five percent (5%) less than the lowest prices paid to it for similar materials. The May 11, 1949, agreement between Allis and Samuel E. Magid provided: In consideration of the mutual agreements herein contained, the first party hereby agrees to sell to second party, and second party hereby agrees to buy from first party, one hundred (100) shares of the Common Stock of Tungsten Alloy Manufacturing Co., Inc., a New Jersey corporation, with its principal office in Newark, N.J., being 33 1/3% of the total outstanding Common Stock of said corporation, and to pay therefor upon delivery of said stock certificate the sum of Four Hundred Fifty Thousand Dollars ($450,000). On May 11, 1949, Magid executed the following letter of indemnity to Allis: This will confirm our understanding and agreement that in consideration of one dollar ($1.00) and other good and valuable considerations receipt of which is hereby *236 acknowledged, I hereby agree to hold you safe and harmless from any suits, claim or damage by or on behalf of P. T. Baker, J. G. Baker and/or Joseph B. Montgomery, Jr., arising out of any connection which you have or may have had with these parties, Penn-Ohio Steel Corporation and/or the undersigned. The agreement of April 29, 1949, between Allis and Penn was a complete agreement in itself. It was separate and apart from the agreements of May 10 and May 11, 1949, between Allis and Tungsten Alloy, and from the agreement of May 11, 1949, between Allis and Magid. Pursuant to the agreement of April 29, 1949, Penn paid Allis $270,000 in full payment and in lieu of damages sustained by Allis by reason of breaches of contract by Penn; and Penn redeemed the 5,000 shares of preferred stock at par and paid Allis therefor $500,000. The total sum paid by Penn was $770,000. The settlement with Penn and the written agreement of April 29, 1949, were bargained and negotiated at arm's length and in good faith by Allis and Penn through their respective representatives. The written agreement of April 29, 1949, was prepared by counsel for Allis; it was executed in good faith as a fair and appropriate *237 disposition of the rights and interests of the parties; it set forth all of the terms to which Allis and Penn agreed; it was not a sham or fictitious agreement. Pursuant to the agreement of May 10, 1949, Allis paid Tungsten Alloy Manufacturing Co. $30,000, for which it received 1,200 shares of Tungsten Alloy preferred stock. There was no agreement that Allis would resell this stock. The purchase was a bona fide transaction. Allis had a right under the agreement of May 11, 1949, to purchase two products of Tungsten Alloy, tungsten carbide and "Speedaloy", a high speed tooled steel. Allis thought that these products might be used in the manufacture of some of the machinery it made, and put samples of these products through its research, shop, and production departments. Allis concluded that the products were fair but decided not to purchase any of them. Under the agreement of May 11, 1949, with Magid, Allis paid him $450,000 for 100 shares of common stock of Tungsten Alloy. The agreement of May 11, 1949, with Magid was negotiated and bargained at arm's length and in good faith; it was prepared by counsel for Allis; it was executed in good faith as a fair settlement of the individual *238 claims of Magid, Montgomery, and Baker against Allis. There was no agreement that Allis would resell this stock. The Allis purchase of 100 shares of Tungsten Alloy common stock from Magid was a bona fide transaction. In a letter to Montgomery, dated January 25, 1949, Magid confirmed an agreement of Montgomery to give Magid the first refusal if Montgomery should decided to sell any or all of his Penn common stock; and Magid agreed that in such event, he would buy from Montgomery at any time within one year a minimum of 500 shares of such stock at a minimum price of $262.50 per share. In June 1949, Magid purchased 500 shares of Penn common stock from Montgomery for which he paid Montgomery $131,250, or $262.50 per share. In a letter to Baker dated January 25, 1949, Magid confirmed an agreement of Baker to give Magid the first refusal if Baker should decide to sell any or all of his Penn common stock; and Magid agreed that in such event, he would purchase from Baker at any time within one year a minimum of 300 shares of such stock at a minimum of $313.25 per share. In June 1949, Magid purchased 500 shares of Penn common stock from Baker for which he paid Baker $156,625, or $313.25 *239 per share. In its return for 1949, Penn deducted $270,000 as "damage claims settlement", and showed in the balance sheets, Schedule L of the return, that it had retired all of its preferred stock, 5,000 shares. The books and the return of Penn reflected all of the terms of the settlement agreement between Allis and Penn. In his return for 1949, Montgomery reported the sale of 500 shares of Penn common stock for $131,250, and a long-term capital gain from the sale. In his return for 1949, Magid reported capital transactions in 100 shares of Tungsten Alloy common stock, and in the 1,000 shares of Penn common stock which he had purchased from Montgomery and Baker for the total sum of $287,875. Ultimate Findings of Fact 1. Penn did not receive, constructively or otherwise, $200,000 from Allis in 1949, or any other amount. 2. Penn owed Allis $270,000 under the settlement of the claims of Allis for damages for breaches of the 1948 steel contract, and paid Allis $270,000 in 1949 in settlement of all of the claims of Allis and in lieu of all damages. 3. The deduction in Penn's return of $270,000 for damages paid to Allis was a proper and valid deduction; the deduction was not *240 taken with a fraudulent intent to evade tax. 4. Penn did not file for 1949 a false or fraudulent return with intent to evade tax. The statute of limitations bars the assessment of a deficiency in the income tax liability of Penn for 1949. 5. The individual petitioners, Magid and Montgomery, did not receive any distribution from Penn in 1949, constructively or otherwise. 6. The respondent erred in determining that Magid received and failed to report a distribution from Penn in the amount of $182,125, representing dividend income from Penn in the amount of $165,167.45. 7. The respondent erred in determining that Montgomery received and failed to report a distribution from Penn in the amount of $131,250, representing dividend income from Penn in the amount of $119,029.39. 8. Respondent failed to prove by clear and convincing evidence that for 1949 Magid filed a false or fraudulent return with intent to evade tax. The statute of limitations bars the assessment of a deficiency in the income tax liability of Magid for 1949. 9. Respondent failed to prove by clear and convincing evidence that for 1949 Montgomery filed a false or fraudulent return with intent to evade tax. The statute *241 of limitations bars the assessment of a deficiency in the income tax liability of Montgomery for 1949. Opinion In these cases assessments of deficiencies are barred by the statute of limitations unless it is established that each taxpayer filed a false or fraudulent return for 1949 with intent to evade tax. Unless the taxpayers filed fraudulent returns, all of respondent's determinations fall. Sections 275(a) and 276(a), 1939 Code. Under section 1112, the respondent had the burden of proving fraud. The taxpayers were not required to move forward to disprove fraud until they were confronted at the trial with proof of fraud. ; affirmed per curiam . Since the deficiencies were barred, unless fraudulent returns were filed, none of the respondent's determinations have the benefit of a presumption of correctness, and respondent had the burden of proving that there was a basis in fact for his theories which constituted the basis for his determinations of fraud and his related determinations which gave rise to the deficiencies. All of the record and respondent's contentions and argument have been given the *242 fullest consideration. Since direct proof of fraud is often difficult, it is necessary to scrutinize the transactions and all of the surrounding circumstances. Fraud may be gathered from circumstances. It is recognized that the respondent relies on two broad principles of tax law; that the substance of transactions rather than their form is determinative of their tax consequences, and that if in fact various steps constitute a single transaction, it may not be broken up into separate ones for tax purposes. This Court is cognizant of these general principles and is not slow in applying them when satisfied that the evidence requires their application. However, each case stands upon its own particular record and proven facts. Petitioners recognize these principles, but they contend that the substance of each of the settlement agreements in question is accurately and entirely reflected by its terms and form. They argue that respondent's determinations are arbitrary, without foundation in fact, based upon suspicion, and represent a misconstruction of the bargaining and negotiating which took place between Allis and Penn, and between Allis and Magid for the individuals, Magid, Montgomery, *243 and Baker, (who is not before us), and of the resulting agreements. The ultimate question to be decided is whether each taxpayer filed a false or fraudulent return with intent to evade tax. In order to decide the ultimate question, it is necessary for this Court to determine whether the several agreements to which Allis was a party were what they purported to be, or whether they were sham agreements devised as a fraudulent tax evasion scheme of Magid, and a fictitious disguise to cover up some other actual agreement, as respondent contends. There is no real dispute about many of the facts. The controversy has its roots in sharply differing interpretations of the negotiations and bargaining carried on by Hawkinson for Allis, and Magid, who claims that he acted in a dual capacity, first as the representative of Penn and, second, as the representative of the three individuals who, it is alleged, made personal claims against Allis. There is a serious dispute about what were the real and true facts involved in the settlement of the disputes which resulted from the sudden cancellation by Allis of the steel contract with Penn. An exhaustive and painstaking analysis of the entire record *244 has been made, having in mind that the first question is whether each taxpayer filed a false or fraudulent return with intent to evade tax. Since the statute of limitations issue is present, and respondent's determinations do not have the status of being prima facie correct, we do not reach several subsidiary questions unless the respondent proved by clear and convincing evidence that the settlement agreements were a sham and represented a fraudulent tax evasion scheme. However, all of the factors involved in respondent's theories have been considered; none has been overlooked. It is concluded and we find: (1) That there were two bona fide disputes, one between Penn and Allis about the steel contract; and the other, between Magid (representing Montgomery, Baker, and himself) and Allis about the failure of Allis to live up to its assurances in 1948 that it would deal with and help Penn in its undertaking to establish a business of producing and selling steel ingots and in increasing its productive capacity. (2) That Penn was in breach of its contract, and that Allis made a bona fide claim for damages. (3) That there were bona fide and arm's length negotiations and bargaining between *245 Hawkinson and Magid (representing Allis and Penn, respectively) to settle the contract dispute. (4) That there was a bona fide agreement between Allis and Penn under which Penn acknowledged its obligation to restore to Allis $270,000, representing overcharges on steel previously shipped to Allis, which sum was paid by Penn to Allis, which Allis accepted in lieu of all damages. (5) That Penn was not entitled, under the settlement agreement of April 29, 1949, or any other agreement, to receive any moneys from Allis; that Allis did not pay any sum to Penn, constructively, or otherwise; and, in particular, that Allis did not pay $200,000 to Penn, constructively or otherwise. (6) That Penn was entitled to a deduction for the $270,000 paid to Allis; and that in its return, the income of Penn was not understated by either $200,000 or $470,000. (7) That there has not been presented by the respondent clear and convincing evidence that the agreement of April 29, 1949, between Penn and Allis was in fact a fraudulent scheme or part of a general fraudulent scheme for the evasion of taxes by either Penn, or Magid, or Montgomery, or by all of the petitioners. (8) That Penn did not file a false or *246 fraudulent return for 1949 with intent to evade tax. (9) That $470,000 of Penn's earnings was not siphoned off through Allis, as a conduit, to Magid and distributed by him among the three common stock shareholders of Penn - Magid, Baker, and Montgomery. (10) That there is not clear and convincing evidence that the petitioners, Magid and Montgomery, received dividend income from Penn in 1949, which they failed to report, as the result of the negotiations with and the agreements of Allis; and that there is not clear and convincing evidence that either Magid or Montgomery filed a false or fraudulent return for 1949 with intent to evade tax. Whether or not each petitioner filed a false or fraudulent return with intent to evade tax depends upon whether the respondent established by clear and convincing evidence, under his burden of proof, that (a) Penn constructively received moneys from Allis; and that (b) the individual petitioners thereby received a constructive dividend from Penn. Under the findings and conclusions, the main issues presented are decided for petitioners; assessments of the deficiencies in these cases are barred by the statute of limitations. See . *247 The foregoing is sufficient to dispose of these cases, but in view of the complexities of respondent's contentions and the seriousness of his determinations, it is advisable to state the following: This Court will not presume to renegotiate the disputes or rewrite the contracts which were executed, in the absence of clear and convincing evidence that the written contracts do not represent the true and complete agreements of the parties and that the negotiations were not bona fide and were not carried on at arm's length. See, for example, ; , where although the questions and the facts were different, a similar problem was presented. Nor will we undertake to narrate all of the circumstances which the respondent claims were questionable. To do so would confuse the considerations of the chief questions. The respondent determined that the income of Penn for 1949 was understated, with fraudulent intent, in the amount of $470,000, which resulted from Penn's failure to include in income $200,000, which respondent claims was constructively received fromAllis, and from Penn's deduction of $270,000, *248 which respondent contends was no more than a fiction, was not truly a payment of damages to Allis, and was part of a general tax evasion scheme. It is respondent's view that Magid and his associates devised a tax evasion scheme whereby $470,000 of Penn's income was siphoned off through Allis, as a siphon or conduit, to the three common stock shareholders, Magid, Montgomery, and Baker. He contends that the individuals did not have any bona fide claim against Allis; that they induced Allis to pay out the net sum of $470,000 to them under a fraudulent plan involving the purchase by Allis of stocks of Tungsten Alloy Corporation, which was followed by Magid's purchase of 1,000 shares of the common stock of Penn from Montgomery and Baker, which respondent contends was a means of giving them their share of the $470,000. The petitioners vigorously deny all of respondent's theory and interpretation of what was done. This Court is unable to conclude that there is clear and convicncing evidence that such overall tax evasion scheme was involved in the several agreements which were executed by Allis, Penn, and Magid. The background of the Allis and Penn dispute is as follows: In 1948, steel *249 was scarce and the end-users, including Allis, were "desperate" in their efforts to get necessary supplies. Montgomery is an experienced steel man. He and Magid were able to lease a Navy reserve steel plant at Birdsboro and believed they could start a profitable business, but they needed additional capital and some firm commitments from a buyer or buyers of what they could produce, steel ingots. They carried on negotiations with Allis through Hawkinson. Allis was willing to invest $500,000 in Penn and gave Magid and Montgomery assurances of substantial future business and of help in getting an additional furnace installed, provided Allis received a priority in Penn's production. Magid and Montgomery had inquired of others about doing business, selling steel, and raising capital. Magid told Hawkinson in 1948, before the Allis-Penn contract was concluded, that he had an opportunity to sell some of the Penn stock for a profit of $500,000, and that he wanted firm assurances that a contract with Allis would represent a good business decision. The Executive Committee of Allis met with Montgomery and Magid and decided to invest $500,000 in Penn, to enter into a steel contract, and they gave *250 the assurances requested. All of these matters involved serious business commitments. For Penn and its stockholders, the decision to do business with Allis was critical; Penn was a new corporation. Later, after Allis cancelled the contract, in 1949, for several reasons including Penn's breaches of contract, changes in the steel market, easier supplies of steel, and lower prices than were fixed under the Penn contract, one of the chief counsel for Allis, Louis Quarles, recalled the 1948 assurances of Allis, the 1948 negotiations with Montgomery and Magid, and he had some anxiety about the claims against Allis which Magid made in 1949, for himself and his associates, because Quarles and his associates "felt there might be a possibility of a promissory estoppel being asserted against Allis-Chalmers" by Magid and his individual associates. A bona fide steel contract had been made in 1948 between Penn and Allis. Early in 1949, Allis became dissatisfied with Penn's contract performances and suddenly cancelled the contract after due deliberations. There were valid grounds for the cancellation. Penn committed breaches of contract which Allis would not overlook. Quarles felt that "Allis was *251 well within its rights in cancelling the contract and had a claim against Penn Ohio for damages." Penn objected, and there arose a bona fide business dispute. However, the action of Allis in cancelling the contract after only 6 months, gave rise to another dispute. Magid, for himself and his associates, as individual business men who had started a new business and relied on the assurances of Allis with respect to Penn's first contract, made claims against Allis for ther personal losses of other profitable business opportunities in the summer of 1948. About these individual claims, Quarles, both a member of the Executive Committee of Allis and its senior counsel, testified: I recall meeting Samuel E. Magid, Joseph B. Montgomery, Jr., and John J. Baker in the late spring or early summer of 1948. They came here to negotiate a contract with Allis Chalmers for the purpose of supplying Allis Chalmers with steel which was at that time very difficult to get and at premium prices. They represented that they owned and controlled the Penn Ohio Steel Corporation that had a steel plant at Birdsboro, Penn. which they had just taken possession of under a lease from the Navy. The arrangement was *252 worked out whereby Allis Chalmers was to put in capital in the form of preferred stock and a term contract entered into which gave it a preferential right to purchase steel from that company. Most of the negotiations were between Mr. Magid and Walter Hawkinson, then Secretary and Treasurer of Allis Chalmers. Most of the discussions on behalf of the eastern people were by Mr. Magid. It was represented at the time that with proper financing they could increase their capital and construct an additional furnace. Magid said he could negotiate a contract with other companies but that he preferred to deal with Allis Chalmers. He also stated that he and his stockholders were losing possibilities of substantial immediate gain if the contract were entered into but he hoped to recoup their situation by continuing relationship with Allis Chalmers. My recollection is that they had an opportunity for an immediate capital gain in the sale of their stock but did not take it because of the continuing situation in regard to the contract. Messrs. Magid and Montgomery appeared before the Executive Committee stated their situation and the foregoing statements I believe were made at that time. The Allis *253 Chalmers people had known of Mr. Montgomery and his record as a steel man and were favorably impressed. * * *
In the course of the conversions [in 1948], the question of dealing with the Navy came up as it was apparent that their consent would be necessary, if new furnaces were to be built. I believe Walter Geist, who was then President of Allis-Chalmers, stated that the company had a great deal of work with the Navy and he might be able to assist at least to the extent of seeing that the Penn Ohio people would meet the right people. The work done under the contract by Penn Ohio was disappointing, They [Penn] fell behind in deliveries and did not give Allis-Chalmers the preferred delivery to which they were entitled. Instead, they made deliveries to Ford Motor Company. Inasmuch as the purpose of the contract was to obtain steel when there was a short supply, Allis-Chalmers felt greatly grieved, with the result that on March 31, 1948, Allis-Chalmers elected not to receive the additional steel to which it would have been entitled, and later, April 7, 1949, served formal notice of the cancellation of the contract. At this time, I turned the matter over to my then partner, *254 Leo Mann, with instruction to take charge and handle it. * * *
At no time during these negotiations was there any consideration given to the impact of income taxes upon anybody by me. Neither the tax counsel of Allis Chalmers nor the tax counsel in our office were consulted. In view of the breach of the contract by Penn Ohio it was not contemplated, nor did we expect or authorize, Hawkinson to pay any of the money to the company [Penn] by way of settlement. The financial outlay on behalf of Allis Chalmers was to cover all claims that might be asserted by individuals and it was expected that a release would be secured all around. From time to time, progress of the settlement contracts or changes were reported to me, for example, the substitution of Tungsten stock for that of Penn Ohio. Being advised that Walter Geist, President, and Walter Hawkinson thought the substitution advisable, I saw no reason for not concurring as it appeared to me that there were no legal questions involved. The final negotiations were completed by Hawkinson in New York and reported to the Executive Committee. There was, at one time, a limit of $200,000 and Hawkinson explained that he had exceed *255 [exceeded] it by $10,000, which, in view of the magnitude of the transaction, was approved. At no time during the negotiations was any question of avoidance of tax raised and no one on behalf of Allis Chalmers nor my office had any participation in or design to, or attempt to mitigate or affect the impact of income tax upon anyone. The settlement was not at all tailoredto that end. It was one which was insisted upon with Allis Chalmers as the only means of settling the entire matter. * * * The testimony of Hawkinson is to the same effect. He testified that at the beginning of the 1949 settlement negotiations, Magid reminded him that he and his associates had given up an opportunity in 1948 to sell part of their Penn common stock for a profit of $500,000 in order to deal with Allis; that because of the assurances of Allis that it would help Penn obtain additional furnaces which would increase its production, Magid had committed himself to purchase part of the holdings of Penn common stock of Montgomery and Baker for a very large price; that Magid showed the commitment to Hawkinson; and that, therefore, the termination of the steel contract presented two problems for settlement, *256 the dispute between Allis and Penn relating to the contract, and the personal, individual claims of Magid and his associates "based upon the loss of their original opportunity and the failure of assurances given [by Allis]." Hawkinson also testified in answer to certain questions, as follows: Q. Now these negotiations for a settlement resulted in a settlement of two separate sets of claims, did they not? * * * Between Allis-Chalmers and Penn-Ohio on the one hand, and Allis Chalmers and Magid in behalf of his associates Montgomery and Baker on the other hand; is that right? A. That's right. Q. Those negotiations resulted in a settlement to that effect? A. That's right. Q. Were those negotiations conducted in good faith? A. They were. Q. Were they conducted at arm's length? A. They were. Q. They were reduced to writing; that is, the settlements as concluded were reduced to writing; is that right? A. They were. Q. In the form of agreements between the several parties? A. And other documents, related documents. Q. Did the agreements and the related documents reflect truly and honestly the settlements negotiated and concluded between the parties? A. Yes. *257 Q. Were the settlements entered into for the purpose of masking or disguising the true nature of the transactions? A. They were not. * * *
Q. That $470,000 was to be paid to Magid for part of his common stock in Penn-Ohio provided he furnished you at the closing with general releases of all of the parties and provided Penn-Ohio made good upon its port of the agreement of settlement? A. That is true. Respondent failed to prove by clear and convincing evidence his contentions that there was but one settlement agreement; that there were not bona fide, individual claims of and made by Magid, Montgomery, and Baker against Allis in 1949, based upon their reliance on the promises and assurances of Allis in 1948; and that the individual claims were part of a fraudulent tax evasion scheme. He failed to prove that "the taint of fraud" pervaded all of the transactions (as he states it). Upon the whole record, findings are made to the contrary. The evidence establishes that there were two settlement agreements. The first was between Allis and Penn, dated April 29, 1949. It settled the dispute about the 1948 steel contract and the cancellation thereof. Its terms constituted the *258 settlement. The agreement was bona fide, was negotiated at arm's length, and it was not fraudulent or part of any tax evasion scheme. Allis did not agree to pay Penn $200,000, for any purpose, and Penn did not receive $200,000 constructively or otherwise, from Allis. Penn agreed to pay and paid Allis $270,000 in lieu of all damages claimed by Allis, for which Penn was entitled to take and correctly took in its return a deduction. Respondent erred in increasing Penn's income by $470,000. The respondent adopted the theory that there was in the negotiations a splitting-up of the contract - cancellation dispute into two parts; that Allis wanted restitution of overpayments it had made on the delivered steel due to overcharges by Penn, but that Penn wanted compensation from Allis for the cancelled part of the tonnage, 22,949 tons, and that a settlement was made on that basis, namely, a payment by Allis of $470,000 for the cancelled tonnage, and a payment by Penn of $270,000 to restore the overcharges, resulting in a net payment to Penn by Allis of $200,000. Respondent failed to prove this theory by clear and convincing evidence. We are satisfied from the entire record that there was not *259 any such agreement. Respondent's theory represents his renegotiation of the dispute between Allis and Penn and his rewriting of the settlement agreement of April 29, 1949. Lacking clear and convincing evidence in support of respondent's theory, this Court may not and will not renegotiate the dispute and substitute a wholly different settlement agreement for the one which was written and executed after arm's length and bona fide negotiations. Since there is not clear and convincing evidence that the claim of Madig and his associates against Allis was a sham and that the settlement thereof was a fraudulent scheme, it may not and cannot be concluded that the $450,000 paid by Allis to Magid for Tungsten Alloy common stock, and the $30,000 paid by Allis to Tungsten Alloy Corporation for some of its preferred stock represented a constructive payment to Penn by Allis in settlement of the steel contract dispute. Respondent's contention that there was but one settlement agreement with Allis is consistent with his general theory that the individual claims of Magid and his associates were a sham and that the agreements relating thereto were a fraudulent device. However, the evidence establishes *260 that there were two separate disputes and settlements; that all of the executed agreements were prepared by counsel for Allis; and that the Executive Committee of Allis required and directed that one dispute could not be settled unless the second dispute also was settled and Allis received a general release from all of the parties of all claims against it. Accordingly, the two settlements were interdependent, but the requirement of Allis that one dispute could not be settled unless the other dispute also was settled, did not make and constitute in substance one settlement agreement out of the two separate settlements. The principle stated in , certiorari denied ; and , does not apply here. Another element which respondent has regarded with suspicion is that the Executive Committee of Allis, on April 26, 1949, authorized Hawknsion to conclude the settlement of all of the disputes on the basis of a release of all claims "at a cost [to Allis] not to exceed $200,000.00, plus the accrued dividends on the preferred stock" held *261 by Allis. The record shows that the above direction in a minutes of an Executive Committee meeting was somewhat ambiguous. The direction was succinct and did not go into detail. But the Executive Committee, at its meeting, was not engaged in drafting a contract or any one of the settlement agreements; they were written by counsel for Allis. The evidence as a whole establishes that the direction meant and was intended to mean that in view of the details of the negotiations by Hawkinson up to that point, which he had reported to the Executive Committee, the Committee fixed as the limit of the net cost to Allis of settling all of the claims, $200,000. This did not mean that the Executive Committee of Allis agreed to and directed that $200,000 should be paid to Penn. It did mean that the Executive Committee recognized that a separate claim was being made by Magid against Allis on behalf of himself and his individual associates, and that Allis was going to pay out funds to satisfy this claim which would represent a net cost to Allis of $200,000 after receiving Penn's payment of $270,000 in lieu of all damages. There is not clear and convincing evidence that respondent correctly interpreted *262 this element. To the contrary, it is concluded that he distorted and misinterpreted the real and correct meaning of the foregoing direction of the Executive Committee of Allis, and that he erred in this respect by lifting this item out of the context and background which existed when this directive was given. Respondent's misconstruction of this item is indicative of the complexity of his whole theory which represents, in effect, his renegotiation of all of the negotiations and his rewriting of the agreements. We do not have in these cases clear and convincing evidence that the substance of the settlement agreement between Allis and Penn dated April 29, 1949, that the substance of the settlement agreement between Allis and Magid dated May 11, 1949, and that the substance of the agreements between Allis and Tungsten Alloy Corporation, dated May 10, and May 11, 1949, was not, in each instance, accurately and completely reflected by the terms and form of each agreement, as negotiated, executed, and carried out. It is concluded that the substance of each agreement was accurately and fully represented by the form and terms of each agreement. The individual petitioners reported in their *263 returns capital transactions involving the purchases and sales of stocks of Penn and Tungsten Alloy. There is not clear and convincing evidence that the purchases and sales of those stocks represented false transactions which were carried out with intent to evade taxes. "Although the existence of fraud may be gathered from circumstances, the piling of inference upon inference hardly qualifies as the clear and convincing evidence by which fraud must be proved." . Respondent's determinations that false and fraudulent returns were filed with intent to evade tax are based upon the piling of inference upon inference, derived from his interpretations of all of the circumstances which surrounded the settlement of the disputes. His inferences and conclusions about the circumstances fall far short of the required proof of fraud by clear and convincing evidence, and we cannot find and conclude that in all of the agreements and transactions there is the sinister implication that the forms and outward appearances of the settlement agreements (between Allis and Penn, and between Allis and Magid) were a cloak to disguise a deliberate scheme *264 of fraudulent tax evasion of the petitioners. See . The respondent must, of course, exert great diligence in protecting the revenues and thwarting tax evasion schemes. But it is well established that a taxpayer may decrease the amount of what otherwise would be his taxes by means which the law permits, ; . That principle may not be overlooked where fraud is not proved. See, also, (February 18, 1964). In the cases of the individual petitioners, the respondent tied up their stock transactions with his general premise that there was a dividend distribution by Penn of $470,000. Since that determination is rejected and it is concluded that the statute of limitations bars the deficiencies, there is no issue before us about whether their stock transactions, as separate and distinct transactions, gave rise to capital gains or losses which can be recognized for tax purposes. Whether or not each petitioner filed a false or fraudulent return with intent to evade tax is a question of fact. Fraud implies *265 bad faith, intentional wrongdoing, and the sinister motive of evading tax. Fraud is never imputed or presumed. The proof required to establish the fact of fraud is clear and convincing evidence of an intention to evade tax. The fact of fraud is not proved by the ordinary preponderance of evidence; nor by doubts as to the intentions of a taxpayer; nor by mere circumstances which seem to create inferences of fraud. ; ; ; ; and ; 285; and , both modifying Memorandum Opinions of this Court. Respondent has not presented clear and convincing evidence that each petitioner filed a fraudulent return with intent to evade tax. It follows that the assessments of the deficiencies are barred by the statute of limitations. Decisions will be entered for the petitioners. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Joseph B. Montgomery, Jr., and Mary C. Montgomery, Docket No. 84059; Samuel E. Magid and Evelyn Magid, Docket No. 84060.↩